Case 24-3610, 24-3611, 25-1011, United States v. Michael Cross, LaShawn Hensley, and Devante French. May it please the court, counsel. I am Webb Wasmer, representing Devante French. I want to spend my limited time this morning primarily talking about the issue of insufficient evidence that Mr. French joined the RICO conspiracy. The government had to prove beyond a reasonable doubt that Mr. French voluntarily and intentionally joined the conspiracy that was charged in Count 1. It was not enough for the government to show the existence of a conspiracy, they had to show that Mr. French joined that conspiracy. So the first point on this issue is that it's not enough to be a member of a gang to be a member of a RICO conspiracy. Gang and RICO conspiracy are not co-extensive. So let me give you a simple example. Say we have a gang of 10 people. Five of those people get together and agree they're going to go out and commit a murder, and then a few months later they agree that they're going to go out and commit another murder, and they do so. Those five people have joined a RICO conspiracy. The other five members of the gang have not. So in looking at what types of evidence show joining a conspiracy, in a typical conspiracy case the government would have... Isn't the standard that if your client knew about those predicate acts and agreed to facilitate them in some sense, that he is part of the RICO conspiracy? That would be the standard, but there was no evidence that he knew about many of these acts or participated in them or agreed to participate in them. So what is the threshold? He needs to know of two predicate acts and needs to agree to facilitate two? Right. Is that how I should think about it? Right. And also it has to be before those acts are committed, I believe. It can't be somebody told him about it afterwards. So typically in a conspiracy you would have, for example, co-conspirators coming in, testifying as to what happened, the agreements. There might be phone calls or texts that the government has uncovered. Here the two insider witnesses, CP and DH, really had no information about Mr. French. He was incarcerated on other types of charges during most of the time that these events occurred. Including the events of May and June of 2020, the burglary of the Necker's Jewelry and all the events relating to that. So the other way the government could show this, the way they attempted, was showing participation in RICO predicate acts. So certainly somebody can be found to be a member of a conspiracy if they have participated in a RICO predicate act. So the government had four acts that they were basically presenting evidence on. Two of those, the district court found, were not RICO predicate acts. The 2009 drive-by shooting and the 2022 shooting of Warren Slocum. So those two acts are out of the picture. The other two acts were a 2012 drive-by shooting of Connie Bragg and a 2022 shooting of Odellis Trigueros. With regard to the 2012 shooting, that was not an attempted murder. RICO has, for predicate acts, they have to be specific types of crimes. The only witness who testified to that event basically stated that one shot had been fired. She was not sure if it had been fired by Mr. French or the other person in the car, Mr. Cartwright. And it was fired into the ground. It was not fired at the victim. The evidence there does not show attempted murder because it does not show an intent to cause the death of another person. At most, it would be an assault or an intimidation with a dangerous weapon. So I think that one fairly easily goes out as well. How did the district court address that? Forgive me, I don't remember. There's quite a few different. The district court didn't spend a lot of time addressing that. Also, the government is brief before this court has not spent much time addressing that. But the basic argument there just can't be an attempted murder because of the one witness, how she testified it occurred. The other issue, the other incident was the 2022 shooting of Mr. Trigueros. There's two issues with respect to that. Insufficient evidence that Mr. French was the person who shot her. And that is largely based on the timing. The events of when the 911 calls came in and the data from the vehicle that Mr. French had showing when he was at the vehicle. And he was at the vehicle before Mr. Trigueros was shot, according to the 911 calls. And there was also a several block distance between them. The other issue with that is the evidence connecting the shooting of Mr. Trigueros to the RICO conspiracy. The government's evidence there was pretty speculative. They were basically arguing that Eric James had a child with Mr. Trigueros. That Mr. James shot Thomas Richardson. That Thomas Richardson's brother, Tyrell Richardson, had Mr. French shoot Mr. Trigueros in retaliation. There were only evidence of that with some phone calls between Tyrell Richardson and Mr. French in the few days prior to the shooting. Why isn't that enough for a rational jury to conclude that it was a retaliatory shooting? Because there was an explanation for those phone calls presented by a witness who stated that those calls related to a dispute between Mr. French and Tyrell Richardson about a car. There was also the point that there hadn't been any calls between them prior to that. And there was really no evidence that Tyrell Richardson was part of the gang. So it just was insufficient to show that this theory was correct. I see there's two minutes left. I'm the one doing rebuttal. So I would like to reserve that unless the court has any kind of questions here. You may. Thank you. May it please the court. Counsel. Good morning. My name is Brian Johnson. I am representing Michael Cross, the appellant on this matter. For Mr. Cross, I wanted to touch upon a couple different matters with regards to this, some of which the court has heard to some degree. But I wanted to bring it around specifically to Mr. Cross. The first deal with, frankly, with the trial standard and whether or not there's sufficiency of the evidence to convict on conspiracy to join into the RICO enterprise. For the reasons this panel has already questioned a number of attorneys about, obviously there is the challenge of whether or not the enterprise existed in this matter. As Your Honor indicated, this can be distinguished from Quinn, which was obviously a very recent case, very, very similar. In fact, there's mentions in the Quinn decision that supposedly zone 5th was actually the side that they were feuding. So it's almost two sides of the same coin. Were roughly the same witnesses testifying at both of these trials? And I'm not asking to sort of do a red line between the two transcripts, but to your understanding, was there any material difference in the way these two cases were tried as a factual matter? Not largely, Your Honor. I would say that just off the top of my head, I know that between the first group and our group, the government did switch who they used as their quote unquote gang expert for that. Beyond that, while obviously there would have been some officers and different laypersons that were involved with different cases, it was largely the same in my opinion. So this is a situation where this enterprise isn't just simply, as was indicated in the Quinn case, where this was a break off from another organization where they made a specific affirmative decision to keep this. The way that the long term law enforcement described this enterprise in this matter is this is just started off as an apartment complex and started off kind of on the street area and things like that and just kind of evolved over time. And frankly, evolved over a great deal of time. This was a 30 some year allegation of basically this started in the 90s and has just drifted clear until the 2020s essentially. Which brings it specifically to Mr. Cross and his determination of whether or not he actually ever joined the enterprise, actually joined the conspiracy. And that goes to a lot of what has already been addressed with regards to, obviously there doesn't have to be a strict structure. Boyle's very clear on that. There's no issues there. But in this situation, the things that the government points to and pointed to at trial with regards to this is how we know these people are associating with one another. Things like hand signs, like your honor mentioned, and things like that. They frankly just didn't produce any evidence that Mr. Cross was participating in those. Mr. Cross participated in some text messages regarding the Necker's break in because that's what it was. It did unfortunately develop into a shooting, but it was to go break into a store during, by all officers' accounts, a night of significant unrest in the community. So to basically look at things like the clothing or holding themselves out, feuding on social media. Let me ask you about that. Wasn't there a social media post that said, in part, won't find another gang like ours? There was. And there was also testimony from layperson witnesses, not necessarily even officers, that the gang can be used just basically as a term for a group. It was not necessarily referring to anything with regards to, quote unquote, Zone 5th or 5th Street or whatever they wanted to call it during that time period. One of the other issues that they specifically point to is this idea that they would bond people out of jail, raise money for people's commissaries, things like that, while they were in custody. Mr. Cross was in custody for all but seven months. He was either a juvenile or in custody for all but seven months of this entire supposed existence of this enterprise. He was not getting out of jail. He was not getting any of those benefits that were supposedly being done. They did produce pictures of him. Instead of these hand signs that they had specifically identified as Zone 5th, he either was flipping off the camera, which is potentially juvenile, but certainly not a gang sign, or putting up an R, which is for Rock Island. There was testimony from law enforcement, frankly, some of the high school teams, much like Mr. Carr's reference to West Union in the first group. I did also want to touch upon the Cross reference with regards to Mr. Cross. Again, the attempted murder Cross reference came in on this case, basically under the Neckers incident as well as the alleyway shooting. There is no evidence that Mr. Cross was a shooter on either of those. He was present. There is no question about that. I would say that the Nichols case is the most analogous situation to this. I would state also with regards to the alleyway, we did hear some discussion previously about this conversation between my client and CP in the jail. This occurred shortly after the alleyway shooting, before any discovery would have been produced or anything like that. Mr. Cross described where everything happened, and it matched up, frankly. That goes to, again, while there is not necessarily proof of exactly who shot what, it goes to the fact of his truthfulness and that he was identifying who was involved here. He wasn't a getaway driver. He was literally laying across the laps of other individuals in the backseat of the car when they left the alleyway. There is no indication he transported people there. Your Honor, I would state that the evidence is insufficient to have utilized that Cross reference for attempted murder. I see my time has expired, unless there are any questions. All right. Thank you, Your Honor.  Good morning. May it please the Court, Counsel, Gentlemen. My name is Corey Goldensoff. I am representing LaShawn Hensley in this matter. We addressed a few issues in the brief. However, I want to focus on the application of the attempted murder guidelines as regards to Mr. Hensley. As a little bit of background, the district court in this matter found that because Mr. Hensley was at the Neckers break-in, this all relates to May 31st, 2020 through June 1st, 2020, the unrest. Because Mr. Hensley was at the Neckers break-in, later on he was found in the alley during the alley shooting. Because he jumped into the car after the alley shooting, because of that combination, the district court felt that was enough for him to be considered to be aiding and abetting the shootings. Now, in my brief, I cited the Nichols case, where in which the court points out that to aid and abet, a couple things need to apply. First, the defendant needs to take an affirmative act in furtherance of that offense. And number two, when he does that, it has to be done with the intent to facilitate the offense that was committed. In this case, first of all, there's no indication whatsoever that Mr. Hensley took any sort of act that would have furthered any sort of attempted murder. The two incidences, the Neckers incident and the alley shooting, are separated by almost three hours. And there's no indication that anybody in the Neckers incident was planning later on to commit some sort of shooting in the alley. The fact that the police officers were there later on was just sort of fortuitous. So there's no way that the government can prove that he somehow knew that that was going to occur. Further, him jumping in the car afterwards doesn't somehow further that shooting. It just, frankly, if anything, it shows that he was trying to escape an active gun zone. So he was just trying to get out of there. I would argue that LaShawn's participation in that entire evening was similar to, in the Nichols case, there are two incidences that are identified with regards to Mr. Nichols himself. The first one is where Mr. Nichols is in a car where a shooting occurs. The court, in that matter, points out that he was in the back seat. Well, the client was in the back seat as well. What were the facts that the district court relied on? Because there were a lot of kind of moving parts here, moving people in both of these. And what were the specific facts that the district court relied on to find your client aided and abetted? Well, like I said, Your Honor, the district court felt that because LaShawn was at the Neckers shooting, he somehow knew that later on in the alley shooting, there was going to be something going on. The district court did point out that other people at the Neckers incident sort of broke off and left, right? But LaShawn stayed with the group. Fine, that's true, but that doesn't indicate at all that LaShawn somehow knew that it was going to occur later on. Was he also one at the cemetery planning? Was your client one of them? Wasn't there a meeting at the cemetery to plan the Neckers incident? Yes, my client was at the meeting. Does that play into it at all?  That was, frankly, to plan a break-in at Neckers. Well, that's sort of as a series of events, sort of planning. I just didn't know if that was relevant. I don't know what happened at that meeting. But they're planning this burglary at Neckers, and then within a few hours, this next event took place after they see somebody that they think is a rival. I didn't know if that had anything to do with his involvement and what he might have known or understood. Well, I would argue, no, it doesn't. But even if it does, it just shows that maybe he had some knowledge about what was going to occur. It doesn't mean that he was somehow taking some sort of affirmative act to aid in that. Maybe it gives him knowledge. But I would argue knowledge isn't enough. You need to have more. You need to do something to aid that act. And there's no evidence of that. I guess I would argue that in the Nichols case, Nichols, if we're talking about knowledge, Nichols had even more knowledge because they had been getting in the car with the purpose to seek out some sort of rival gang member because there was badmouthing. So in that case, Nichols had even more knowledge. And despite that, the court found, well, he may have had the knowledge, but he didn't do any sort of act to further that because he was just in the backseat of the car. My time is up. Questions? I see none. Thank you. Great, thank you. Good morning. Will Ripley here on behalf of the government. Counsel, may it please the court. I intend to, I guess, kind of track a little bit what counsel was just arguing. But I definitely want to start with sufficiency when it comes to the racketeering conspiracy. I'm afraid Mr. Wassmer misspoke a bit on what exactly the government's burden is on that. And that's to show not that his client or any other member agreed to commit two acts of racketeering. No, no, no. The burden is to show that there was an agreement, that that agreement contemplated two acts of racketeering, and that anyone, including Mr. French, joined the agreement knowing that. Not that they had to commit two acts. And, in fact, a racketeering conspiracy exists whether two acts were committed or not. Here, of course, the records replete with act after act after act. So to suggest that the evidence is somehow insufficient with respect to Mr. French because it didn't show which two acts he agreed to commit is a complete misstatement of what's required and the burden that's on the government here. He did, however, show and, in fact, committed just two that the record talks about acts himself. How about the first one where counsel indicated that the shot was into the ground? I think that was in April. Indeed, I think I misspoke a bit. He committed two acts that clearly show and stand up for and scream loudly his agreement to join the conspiracy. It doesn't have to be an actual racketeering act. So whether it's a racketeering act because it was an act of attempted murder or it was not a racketeering act and it was simply a shooting at KB, KB, who was a member of Savage Life, to Judge Kelly's point earlier, the Quinn case he referenced, touches on some of these same groups. Indeed, KB was part of that same group that was involved in the Quinn case. And a clear, longtime, decades-long rival with Fifth Street. And so that shooting is not to be ignored whether it was a racketeering act or not. If it was an act of murder or attempted murder, it was. If it was not, then it wasn't technically a racketeering act. It doesn't mean we ignore it. Because it clearly shows in 2011 or 12, Mr. French's joining up with the Enterprise, knowing full well the point of the Enterprise, aiming at those same things that the Enterprise is aimed at, which is the power that comes from these acts. And so the shooting at KB still informs that issue. And they have to be within, do those have to be within 10 years? What's the 10-year limit? That two acts have to be within 10 years of each other? Yes, two acts. So again, that is a conspiracy-wide limitation, I guess, for lack of a better phrase. So it's not individual defendant limitation? No, it is not. It is not. And so there's act after act after act. That 10-year thing really, I submit, didn't come into play because the conspiracy was so active, regularly active. Certain members, of course, would be more active at times than others because they were. Many of them were incarcerated at different points. But it didn't break up to where that 10-year rule came into play. Additionally, the record is replete with and the jury heard plenty of evidence about French's joining in the conspiracy. He, like so many, plastered social media with evidence of his joining the gang by showing him with other members or him flashing the sign, which was the 5th Street sign. He stored a firearm for another member for a shooting that occurred where Timothy Beaver shot at O.C. O.C. was also a member of that Savage Life group. And that firearm was recovered from Mr. French's house. He posted on social media that kind of a rhetorical question, if you will, which is, can you even say you're 5th Street if you've never lived here? And the here reference is a photograph of what then was called Century Woods Apartment, which is an apartment building on 5th Street in Rock Island, Illinois. Part of a complex that a lot of these men have a connection to. And so certainly sufficient evidence was presented, Mr. French joining the conspiracy. And again, it is a misstatement of the law to suggest that we had the burden to show each and every one of these 14 defendants agreed that they would commit at least two acts of racketeering. That is not the law. They agreed to join the conspiracy, which conspiracy was aimed at, at least two acts of racketeering. Conspiracy doesn't have to complete any. And certainly the extension, the implication of that is that not a single person has to complete any. But here we have racketeering acts completed by each and every one of the 14, and certainly by Mr. French, Mr. Cross, and Mr. Hensley. I'll transition now to the sufficiency of the evidence of Mr. Cross. I agree with the fact that he differs a little bit from some other members of the conspiracy in that his social media presence did not include much photographs of him doing hand signs and things like that. He was in many, many photographs with these people. But of course, that is not the only indication. Whether you're on social media doing hand signs is not the only indication of whether you're a member of this conspiracy. He advertised his connection to some deceased members of this enterprise. There's photographs of him in a COVID-style mask with the names of a lot of deceased members. But as with any group of human beings, certain people's personalities are different. I know some pretty voracious fans of the St. Louis Cardinals, and they don't wear any of the gear. And so it's not the only thing here. His participation in the shooting in 2011 at the Mississippi Valley Fairgrounds, his driving the shooters away from that, again, a shooting at that same group. In fact, KB is common to that as well as the shooting we talked about earlier. Shooting at a rival, and in fact, trying to get himself and other members of the enterprise away from that shooting. So much so that he was convicted of assaulting a police officer by driving the vehicle towards the officers. That is very telling of his participation. And the group chat. The group chat speaks volumes here. It is weeks and weeks and weeks of connection between these men. In particular, the week beginning May 23rd when Timon Mayfield was killed is telling. Because of the back and forth checking in with each other, they knew when Timon Mayfield was shot and killed in that dice game on May 23rd, that things were going to get hot. Very, very hot. And that Fifth Street was going to be a target. And anyone associated with Fifth Street was going to be a target. And so they continually reached out to each other reminding them not to be lacking. In other words, don't be out in the community if you're not armed, if you're not ready. Don't be lacking. And that was a regular part of the group chat. It was a regular part of the group chat to check in on everyone every day. Just to see if anything had happened to anyone. And Cross took part in that. We've heard in the earlier argument, in the hearsay context, the statements that Michael Cross made to CP in the jail. These are telling here too. If he's not part of the Enterprise, why is he telling another member of the Enterprise what the Enterprise had done so that that other member of the Enterprise can be ready to react should the need arise? Again, that's evidence. It's not flashing gang signs on social media, but it's just as powerful evidence. And the jury heard that as well. It's not just what Mr. Cross said to CP. That's informative of other issues in the case and the jury used it that way. But they also used it to just say, yeah, Michael Cross is talking to CP about Fifth Street business. It follows that he's Fifth Street. I'll transition now to the Cross reference. I'll talk about it with respect to Mr. Cross as well as Mr. Hensley. It is correct that with respect to both of these men, there's no evidence that they were an actual shooter at either the Necker scene or three hours later, what we'll call the alley scene. But the evidence was clear that Michael Cross ran around the building along with the others who were shooters. And Michael Cross at that time was armed with a pistol that's shown on the surveillance video. He goes off-frame to an area where there were casings. He's not the only one that goes off-frame to that area. So he may have been a shooter. He may not have been. But the government submits that whether he's a shooter or not is really not that important. The district court did not find he was the shooter. He found that he wasn't able to. And so he said, I'm finding that I can't. So I'm not going to assume you were. And again, because he went off-frame with others. But he did also clearly find that he was armed at the time. And so, but whether you're the shooter or not. So what were, let's start, if you're starting with Cross, we'll start there. What were the district court's facts that it found to apply the Cross reference? That he ran around the building with a pistol. And, of course, those that ran around the building, they mistook AG for a rival, a different rival. And ran around the building. So, and then he left the area. Rearmed with different firearms along with everyone else. And then was in the alley. And fled in the. When you say with everyone else, are you making this argument as to the other two folks on appeal here as well? If we can be specific, because we've got a limited amount of time. You're right, I'm sorry. Which is with three folks. And I want to make sure that we understand both sides as to what evidence the district court actually relied on for each individual person. Because they each had an individual. They did. Role, if any, in what was going on. Right, and the Cross references for Mr. French, of course, have nothing to do with this night. He was not present for Neckers or the alley. Okay, so Mr. Cross. Ran around the building. Had a pistol. Returned back from running around the building. Got in a vehicle. Left the area. Regrouped with, we know, at least six other people. Five of whom were also in the Pontiac fleeing the alley along with him. There were more guns than there were men there. And so the district court looked to that as everyone, the evidence, it's a reasonable conclusion that everyone was armed in the alley. He looked to the fact that Cross jumped into the Pontiac after the shooting along with everyone else. Left the area. And, importantly with Mr. Cross, there's evidence that he tossed one of the firearms out of the window during the chase or the eluding. And so those are the facts that the district court relied on with respect to Mr. Cross. With respect to Mr. Hensley, it's largely the same. But there are significant differences, and I'll point them out, which are Hensley did not run around the building. What he did is when another person who ran around the building, Rasheem Bogan, when he came back from running around the building, his baseball style hat fell off just from running in the wind. And Mr. Hensley ran to retrieve that hat and hand it to Mr. Bogan. So there he's aiding and abetting kind of that. Now, the district court did not find that the Neckers shooting with respect to Mr. Hensley was an appropriate cross reference. I bring that up, though, because it informs the continued behavior on Mr. Hensley's part. I bring up the hat because it informs that. So he, like Mr. Cross, and like six others, five others in addition to him and Mr. Cross, regrouped, got new guns, and three hours later we're in the alley when suddenly the truck arrives that they mistook as a Mayfield truck. And some number of them, four of them, unloaded on that truck. And, again, the evidence did not show who it was that was shooting other than Mr. Toussaint who was deceased and, of course, one of the officers who returned fire. But then, like Mr. Cross, Mr. Hensley gets into that Pontiac along with the seven firearms and they flee the scene, all of them. Neither Mr. Hensley nor Mr. Cross was driving the Pontiac. Obviously, that was Mr. White. But these are the facts, Your Honor, directly to answer your question that the district court did rely on. It's important, however, to think about those facts in the larger context because, again, we're asked to find that there was an act in furtherance and, in fact, that it was intended to facilitate. And so we're talking here about intent and those things that aren't often susceptible to direct proof. So we have to look at the aiding and abetting, both of Mr. Cross and Mr. Hensley and anyone in the big picture context, which includes the decades-long series of violent acts. But even more narrowly and, I think, more importantly and more impactfully is the week between May 23rd and this night of May 31st into June 1st. During that week, we had, at the beginning, Thibaune Mayfield killed. And then we had everyone who was in Fifth Street on high alert. There's evidence, direct testimony from CP talking about, we all knew that we were Fifth Street and things were getting hot. And that's why you see in the group chat this increase in, don't be out there lacking. Hey, everybody all right? Everybody all right? Over and over and over again in those days. There was another shooting at a vigil for Thibaune Mayfield. There was a shooting at a barbecue that the Mayfield family was involved in. It was an incredibly violent week. And it culminated in Mr. Cross and Mr. Hensley and others being at Neckers, armed. Yeah, they were going to loot the place. They were going to burglarize the place. That's not a racketeering act. But everyone who's Fifth Street, especially that week, and it's clear, you see it in the group chat, especially that week, knew that these things were going to happen and knew that they needed to be ready to take part. And when you show up there, and when you leave, and when you regroup, and when you change out your firearms, and when you flee the scene with firearms, and in Mr. Cross's case, toss one out of the window, that is aiding and abetting. There's another support in the record. We addressed this in the brief for the cross-reference to attempted murder for both. And that is, of course, that all of this was reasonably foreseeable. Part of the greater contact. Much of the same thing that I just spent the last few minutes talking about, that week that was, May 23rd to May 31st, informs that. If you're Fifth Street, you can't be lacking. There's a reason for that. Did the district court just decline to go there, or did the district court find that wasn't a viable theory? Decline to go there, I think, would be the thought. For each of the defendants? Yes, for all, even beyond these three here on this panel, Your Honor. You're talking about liability for conduct of co-conspirators? Yes. Isn't that a better fit here? I'm sorry? Isn't that a better fit here, that approach? You know, I don't know, Your Honor, that I agree that it's a better fit. It certainly is a fit. It might be a better fit for Mr. Hensley. I would disagree more with your question when it comes to Mr. Cross, because of his actively running around the building with a pistol. Because he threw a pistol out the window, fleeing from the alley, those types of things. I want to mention one other thing with respect to Mr. Hensley, which is, quite frankly, if there was error here in the cross-reference, whether it be on an aiding and abetting theory, or the reasonably foreseeable theory with Mr. Hensley, that error, I submit, is harmless. Judge Loke of the District Court took great care, and in fact was very specific to describe, frustration is probably too strong of a word, but his dissatisfaction with almost the two options he saw, which is a base defense level of 19 without a cross-reference in the defense level in the 30s, with a cross-reference. And so he landed at the sentence, and he was explicit in this regard, and we briefed it again, but he landed at a sentence that he felt was appropriate, given all of the factors in 3553, in particular those unique to Mr. Hensley and his history and characteristics, but also his violence. Was that one of them, and forgive me for not remembering each of the colloquies, was that one where the District Court expressly said, I see it's a close call, and regardless of the cross-reference, this is my sentence? It was, yes. Okay. Yes, but in particular with this, with his announcing of the sentence for Mr. Hensley, it was very clear and very explicit that the District Court just thought, you know, the appropriate sentence here is ultimately the goal. Obviously guidelines are, as we know, advisory. They're important. Judge Locher indicated that, but they're not controlling. And so he landed in between what would have been a range without the cross-reference and what was ultimately the range when he did find the cross-reference. And so for that reason, if there is error in that decision to find the cross-reference with respect to Mr. Hensley, it was harmless. And unless there are other questions, I see my time has expired. Thank you all. I think the government is misunderstanding what Mr. French's argument here. Mr. French is not arguing that you can't, the government can't prove that somebody joined a RICO conspiracy without committing a predicate act. That's not the argument. The argument here is that first, there was no evidence that he joined a RICO conspiracy outside of participating in RICO acts. The evidence against Mr. French here was basically the jury could find that he was a member of a gang, but that is not in and of itself enough to show that he joined a RICO conspiracy. So I think the government was left with showing that he participated in RICO acts because they didn't have the evidence otherwise showing that he joined a RICO conspiracy. Also, the government is arguing that the 2012 shooting doesn't have to be an attempted murder. I think that is legally incorrect. So say, for example, you had a group of people agreeing to commit two criminal acts, one of which is a RICO predicate act and one of which is not. That would not be a RICO conspiracy because you don't have the two RICO predicate acts. Judge Kelly, you asked a question about the factual differences between the first and the second trial. My feeling when I was sitting at trial was that I was in a completely different trial than everybody else with Mr. French. The acts that were mostly talked about, particularly the events around the Neckers burglary and the shootings that followed that, Mr. French had absolutely nothing to do with because he was in prison in another state at the time. Finally, I just wanted to point out there was some testimony by CP who was one of the two insider witnesses. He really testified there were three different groups here. There was his group that was focused on selling drugs to make money. There was Don White's group, which largely included the people who were in the first trial who were on the wild side and into shootings and feuding. There was a third group that he knew very little, almost nothing about that he called the little dudes, which were younger guys. That would have included Devante French in that group, but he didn't really know much about that group at all. Overall, I would ask on behalf of all of the three defendants here that the court reverse the convictions of these defendants. Unless the court has further questions. Seeing none. Thank you for your argument. Thank you to all counsel for your arguments here today, as well as your briefing, and we will take these matters under advisement.